# EXHIBIT 1

2021 WL 4079207
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

J. B., Plaintiff,
v.
[G6 HOSPITALITY, LLC](), et al., Defendants.

Case No. 19-cv-07848-HSG
|
09/08/2021

[HAYWOOD S. GILLIAM, JR.](), United States District Judge

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** Re: Dkt. Nos. 143, 146, 148

**\*1** Pending before the Court are Rajesh Khatri and Hansaben Khatri's (DBA Economy Inn) ("Economy Inn") motion to dismiss, Dkt. Nos. 146 ("EMot."), 154 ("EOpp."), 158 ("EReply"), and Gangaben A. Patel Trust 2000's (DBA Holiday Motel) ("Holiday Motel") motion to dismiss, Dkt. Nos. 143 ("HMot."), 157 ("HOpp."), 159 ("HReply"), (collectively, "Defendant Hotels"), and Craigslist's motion to dismiss, Dkt. Nos. 148 ("CMot."), 155 ("COpp."), 160 ("CReply"). For the reasons discussed below, the Court **GRANTS** Craigslist's motion to dismiss, **DENIES** Holiday Motel's motions to dismiss Plaintiff's TVPRA claim to the extent that the conduct underlying Plaintiff's claim occurred after December 23, 2008, **GRANTS** Economy Inn's and Holiday Motel's motions to dismiss Plaintiff's CTVPA claims, and **DENIES** Holiday Motel's motion to dismiss Plaintiff's negligence claim and its motion for a more definite statement. Dismissal is with leave to amend, except as otherwise stated below.

**I. BACKGROUND**
Plaintiff alleges that she was "advertised for sale on the Craigslist's 'Erotic Services' and 'Adult Services' classified categories" and "repeatedly trafficked for commercial sex." Dkt. No. 134 First Amended Complaint ("FAC") ¶¶ 1–2. Plaintiff alleges that "she was imprisoned and abused at motels throughout Oakland, including on multiple occasions at each of the Defendant Hotels." *Id.* ¶ 6. And Plaintiff alleges that "[e]ach Defendant Hotel also observed at least one (sometimes multiple) violent encounters between Plaintiff and a trafficker and/or buyer." *Id.*

Plaintiff broadly alleges that Defendant Hotels had actual or constructive knowledge that sex trafficking occurred frequently on their properties due to other news reports and incidents of child sex trafficking and failed to prevent it. *See, e.g., id.* ¶¶ 7, 71, 81. Defendant Hotels allegedly "ignored a common set of signs that Plaintiff was being trafficked," including that the rooms "were frequently paid with cash"; that "Plaintiff's rooms maintained high foot traffic with multiple male adults per day"; that Plaintiff's rooms were "frequently left strewn" with "an inordinate number of used condoms"; and that Plaintiff often showed "signs of distress, malnourishment, and prominent bruising." *Id.* ¶ 60. Plaintiff also alleges that "Defendant Hotel(s) discouraged Plaintiff from asking for help from motel staff or seeking assistance from guests in neighboring rooms." *Id.* ¶ 62. Defendant Hotels allegedly did this because "they financially benefited from her trafficking" because rooms rented to traffickers, who regularly refuse cleaning and other accommodations, are "particularly profitable." *Id.* ¶ 64.

As to Craigslist, Plaintiff alleges that she was "advertised for sale on Craigslist's 'Erotic Services' and 'Adult Services' classified categories" and that Craigslist "knew that these sections were used to sell adults and children for sex." *Id.* ¶ 2. Craigslist allegedly "took numerous steps during the years Plaintiff was trafficked to guarantee—in the face of pressure from advocates and law enforcement—that traffickers could continue to easily utilize its platform as a marketplace for commercial sex." *Id.* ¶ 3. These included simply renaming the "Erotic Services" subcategory to "Adult Services." *Id.* ¶ 34. Plaintiff claims that when Craigslist continued to receive pressure, it again "merely re-positioned the section's illicit and illegal 'Adult' advertisements as 'Personal Ads' and 'Massage Services.' " *Id.* ¶ 35.

**\*2** Plaintiff contends that such changes were purely cosmetic since Craigslist was fully aware of the ways these sections were being used: Plaintiff claims that Craigslist "manually reviewed every single posting on its 'Adult Services' platform—which included advertisements for commercial sex, often with children." *Id.* ¶ 4. Hundreds of commercial sex advertisements were allegedly posted on Craigslist every day. *Id.* ¶ 38. Postings in the relevant sections frequently "contained nude or partially nude photographs (often of children, like Plaintiff), and explicit offers of sex in exchange for payment, alongside well[-]known and widely

recognized language indicating the commodification of sex acts with children." *Id.* ¶ 37. Terms like "young and fresh," "virgin," "new girl," and "new to Craigslist" were allegedly well-known code words for "minor." *Id.* ¶ 41(c). Finally, Plaintiff alleges that Craigslist was incentivized to continue allowing these postings because of the large amounts of cash they generated. *Id.* ¶¶ 2, 49. Fees from traffickers alone "totaled up to an estimated $36 million in revenue for Craigslist in 2010." *Id.* ¶ 49.

As to Economy Inn, Plaintiff alleges that she "was trafficked [there] on at least fourteen occasions," a number of which included violent encounters. *Id.* ¶¶ 72–77. She details several specific instances:

> The first time [Plaintiff was trafficked at the Economy Inn] was in July 2007, when Plaintiff was only fifteen years old. On that date, a white male in his late 30's picked Plaintiff up on International Boulevard in Oakland and drove her to the Economy Inn, where motel staff observed her arrive in his vehicle. The buyer went into the motel and purchased a room for approximately $50 to $60 for the night, and then escorted an anxious Plaintiff to the room—in plain view of hotel staff.
>
> ...
>
> That same year, Plaintiff was violently sexually assaulted at the Economy Inn while still only fifteen years old. On that occasion, a male in his late-40's to mid-50's took Plaintiff to his room in plain sight of motel staff, where he then told Plaintiff that he did not have a condom but still expected her to have sexual intercourse with him. When Plaintiff attempted to leave the room, the male positioned himself in front of the door, holding her against her will. He then forced her into sexual acts that caused Plaintiff great bodily injury.
>
> ...
>
> When Plaintiff was sixteen years old, she suffered another violent sexual assault in broad daylight in the Economy Inn parking lot. A male guest of the Economy Inn pulled a gun on Plaintiff while the two were in his vehicle and then forcibly raped her, causing great bodily injury. The vehicle was parked in an area that was monitored by Economy Inn, including by video surveillance. Moreover, there was additional commercial sex activity occurring in the parking lot at the same time, including the presence of other minor victims and their adult traffickers loitering in the parking lot, which should have alerted Economy Inn staff to the illegal conduct occurring on its premises.
>
> ...
>
> On another occasion when Plaintiff was seventeen years old, early 2009, five pimps entered the Economy Inn and broke down a motel room door to locate and kidnap Plaintiff, leaving her personal possessions in the rented room. This event should have alerted Economy Inn staff that sex trafficking was occurring, as the pimps were very loud when they broke into the room, caused significant property damage in breaking down the door, and then forcibly removed a teenaged girl in plain view of motel staff. The pimps ultimately released Plaintiff on High Street in Oakland and instructed her to meet them back at the Economy Inn after completing a commercial sex act. Plaintiff did not return to the Economy Inn because she was frightened, and instead left all of her belongings—including clothing, shoes, make up, jewelry, and personal items—in the room, which Economy Inn must have collected and discarded, further alerting them to Plaintiff's abuse.
>
> ...
>
> On another occasion when Plaintiff was seventeen years old, in early September 2009, she suffered yet another violent assault inside a room at the Economy Inn. Staff at the Economy Inn must have been aware that a victim of sex trafficking was being brutalized within the room, because Plaintiff's cries for help—which included calling out the number of the room she was in, which she believes was Room 203—were so loud that another guest called the police. When police arrived, Plaintiff—fearing another attack from her trafficker—begged them not to arrest him, and the police did not. Economy Inn permitted both Plaintiff and her trafficker to stay in the room despite this violent incident, because they were renting the room for multiple weeks and were paying in cash.

**\*3** ...

Just two months later, in November 2009, Plaintiff suffered yet another violent assault in a hotel room at the Economy Inn, when her trafficker struck her in the head with an iron. *Id.* ¶¶ 72–77.

As to Holiday Motel, Plaintiff alleges that she was trafficked there "nearly continuously" between September 2007 and September 2009. *Id.* ¶ 91. She claims her stays each

lasted "approximately one week" but sometimes as long as "months at a time." *Id.* Plaintiff alleges that Holiday Motel staff "ignored multiple violent incidents." *Id.* Additionally, Plaintiff details numerous facts that allegedly demonstrate that Holiday Motel knew or should have known that she was being trafficked on their premises. These include:

> Each time Plaintiff was trafficked at the Holiday Motel, she encountered the same manager—a man in his 30's or 40's who wore glasses.
>
> ...
>
> Though Plaintiff's trafficker paid daily for the room, each visit lasted at least one week, and the manager would come to the room every day prior to checkout at 11 a.m. to ask whether Plaintiff's trafficker wanted to rent the room for another day. Moreover, given the location of Plaintiff's room, the manager would have seen the heavy foot traffic by unrelated adult men in and out of Plaintiff's room, as each entered and exited through stairs in view of the front desk.
>
> ...
>
> [S]taff at the Holiday Motel observed multiple violent incidents during the years Plaintiff was trafficked there that should have alerted them to her abuse. In October or November of 2008, the trafficker of another teenaged person being held at the Holiday Motel came to Plaintiff's door looking for this individual. When he did not locate this person in Plaintiff's room, the trafficker broke into the room of another trafficking victim on the bottom floor and started physically assaulting a young girl in that room. The incident was loud and disruptive enough that the Holiday Motel manager called police, and Plaintiff—in the midst of the commotion and fearing for her life— fled her room and called her grandmother to the Holiday Motel.
>
> ...
>
> On or about September 2009, Plaintiff's trafficker became angry and began screaming at her from inside the hotel room, likely because he was under the influence of alcohol and/or narcotics. He then threw some of her belongings outside the second-story window and onto the walkway below. When Plaintiff went to retrieve her belongings, the trafficker locked her out of the room, holding the remainder of her belongings inside. In response, Plaintiff banged loudly on the hotel room door and began begging that he let her back into the room. This entire ordeal occurred at some times in plain view of the manager and at all times was audible to the manager.
>
> ...
>
> [A]round November 2008...Plaintiff's trafficker...physically assaulted Plaintiff, leaving her with a black eye that was visible to the Holiday Motel manager on the next several occasions when he saw her. Yet again, the manager did not inquire about Plaintiff's well-being or offer any other assistance to Plaintiff.
>
> *4 ...
>
> Instead, the manager actually cautioned Plaintiff to "stay quiet" when there was fighting going on, or else risk being kicked out of the hotel, and continued to collect daily fees for the room Plaintiff was repeatedly trafficked in between 2007 and 2009.

*Id.* ¶¶ 92–97.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). Even if the court concludes that a 12(b)(6) motion

should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

### III. CRAIGSLIST'S MOTION TO DISMISS

**A. CDA**

Craigslist contends that Plaintiff's TVPRA claim is barred under section 230(c)(1) of the Communications Decency Act ("CDA"). CMot. at 9. That section states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Court previously found that Craigslist was an interactive computer service, that it was the publisher of the content at issue in this case, and that this content was provided by parties other than Craigslist. Dkt. 132 ("Order") at 6. The Court thus concluded that Craigslist qualifies for immunity under section 230(c)(1) of the CDA. *Id.* The Court considered whether the CDA applies to the state law civil sex trafficking claims and the beneficiary sex trafficking claim under section 1595 of the TVPRA. *See id.* at 5–10, 12. Because the Court found that the CDA applies to state law civil sex trafficking claims and that the content provider exception did not apply, the Court dismissed Plaintiff's state law claims against Craigslist without leave to amend. *Id.* at 11. But the Court found that the CDA did not bar Plaintiff's TVPRA claim brought under section 1595. *Id.* at 12. Craigslist asks the Court to reconsider this finding, citing intervening rulings. Craigslist contends that two courts have held that a civil TVPRA claim falls outside the scope of an interactive computer service's CDA immunity only if the civil defendant's conduct amounts to a violation of section 1591. *See Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242 (S.D. Fla. 2020); *M.L. v. craigslist Inc.*, No. C19-6153 BHS-TLF, 2020 WL 5494903, at *4 (W.D. Wash. Sept. 11, 2020). Having closely reexamined the issue, the Court now finds that section 230(e)(5)(A) withdraws immunity only for claims asserting that the defendant's own conduct amounts to a violation of section 1591. The Court thus reconsiders its prior ruling for the reasons outlined below.

**i. Statutory background**

*5 In 2018, Congress passed the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"), combining a House bill with the same name with a Senate bill, the Stop Enabling Sex Traffickers Act ("SESTA"). Pub. L. No. 115-164, 132 Stat. 1253 (2018). The legislation is now known as either FOSTA or FOSTA-SESTA. FOSTA-SESTA made changes to three statutory schemes: the CDA, the TVPRA, and the Mann Act. Most relevant to the present issue, section 230(e)(5)(A) of the CDA now provides that nothing within that Act shall be construed to limit or impair "any claim in a civil action brought under section 1595 of [the TVPRA], if the conduct underlying the claim constitutes a violation of section 1591 of that title." 47 U.S.C. § 230(e)(5)(A). FOSTA-SESTA also amended the CDA to provide that nothing within that Act shall be construed to limit or impair criminal charges brought under State law "if the conduct underlying the charge would constitute a violation of" either section 1591 or section 2421A.[1] 47 U.S.C. § 230(e)(5)(B)–(C). With respect to the TVPRA, FOSTA-SESTA added a provision to section 1595 authorizing state attorneys general to bring *parens patriae* civil actions against "any person who violates section 1591," and added a definition of "participation in a venture" to section 1591. 18 U.S.C. § 1595(d); 18 U.S.C. § 1591(e)(4). Lastly, FOSTA-SESTA enacted a new offense now codified at 18 U.S.C. § 2421A. Section 2421A proscribes "own[ing], manag[ing], or operat[ing] an interactive computer service...with the intent to promote or facilitate the prostitution of another person," and provides an enhanced punishment for "aggravated violation[s]" by those who "act[ ] in reckless disregard of the fact that such conduct contributed to sex trafficking, in violation of [section] 1591(a)." 18 U.S.C. § 2421A(a)–(b). It also includes a civil recovery provision allowing "[a]ny person injured by reason of a[n] [aggravated] violation" to recover damages. 18 U.S.C. § 2421A(c).

**ii. Statutory analysis**

Here, the Court focuses on the statutory provision at issue, section 230(e)(5)(A). As noted, the parties dispute the scope of the CDA's exemption regarding federal civil sex trafficking claims under section 1595. Is it sufficient that *someone* committed a section 1591 violation that underlies a plaintiff's civil claim, or must a plaintiff show that the conduct of the *civil defendant being sued* amounts to a criminal violation?

Craigslist contends that the phrase "the conduct *underlying the claim*" refers to the "plaintiff's 'claim' against the *civil defendant* who would otherwise enjoy immunity." CReply at 2–3 (emphasis in original). It contends that it would be unreasonable to conclude that Congress "meant to refer to the conduct of some other individual who is not a party to 'the claim' at all." *Id.* at 3. Plaintiff argues that the phrase does not

say that "the claim" must be an alleged violation of section 1591, that it instead references the "facts about trafficking," and that she thus need only allege a predicate violation of section 1591 by someone. COpp. at 18–19; Dkt. No. 173 ("Tr.") at 28:4-11. This would mean that Plaintiff could bring a beneficiary claim against Craigslist for the underlying sex trafficking perpetrated by her traffickers, without needing to show that Craigslist itself would be criminally liable.[2]

Whether section 230(e)(5)(A) requires Plaintiff to show that Craigslist's own conduct violated section 1591 is a question of statutory interpretation. Courts have reached different conclusions on this issue. *Compare Kik Interactive*, 482 F. Supp. 3d at 1249 ("The plain language of the statute removes immunity only for conduct that violates 18 U.S.C. § 1591.") *with Doe v. Twitter, Inc.*, No. 21-CV-00485-JCS, 2021 WL 3675207, at *24 (N.D. Cal. Aug. 19, 2021) (concluding that section 230(e)(5)(A) only narrows the types of section 1595 claims that are exempted from CDA immunity).[3] This Court reads the plain language of section 230(e)(5)(A), "any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591," to limit the scope of civil sex trafficking claims against interactive computer services that otherwise meet the requirements for CDA immunity to circumstances in which the defendant's conduct amounts to a violation of section 1591.

### a. Statutory language

**\*6** The parties do not dispute the ordinary meaning of any of the words in section 230(e)(5)(A). Instead, the dispute centers on the intended meaning of the second clause, "if the conduct underlying the claim constitutes a violation of section 1591." Referencing solely the language itself, the Court finds the most straightforward reading to be that the provision provides an exemption from CDA immunity for a section 1595 claim if the civil defendant's conduct amounts to a violation of section 1591. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). As Craigslist suggests, if Congress meant to exempt all claims involving sex trafficking, it "could have said 'if the claim arises out of a violation of section 1591,' or 'if the plaintiff is a victim of a violation of section 1591.' " *See* CReply at 3.

The Court also finds that this interpretation is supported by "the specific context in which that language is used." *See Robinson*, 519 U.S. at 341. The relevant subsection exempts three specific categories of sex-trafficking-related claims, each predicated on a violation of either section 1591 or section 2421A. As noted, the CDA includes parallel provisions providing that nothing within that Act shall be construed to limit or impair criminal charges brought under state law "if the conduct underlying the charge would constitute a violation of" either section 1591 or section 2421A. *See* 47 U.S.C. § 230(e)(5)(B)–(C). In the context of a criminal charge, the underlying conduct necessarily refers to the conduct of the criminal defendant. Notwithstanding the obvious differences between civil claims and criminal charges, it thus is consistent to construe the provisions referencing "the conduct underlying the" claim or charge "constitut[ing] a violation of section 1591" to refer to the conduct of the named defendant. 47 U.S.C. § 230(e)(5)(A)–(B); *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). That Congress included nearly identical language in the same subsection, at the same time, strongly suggests that it intended to give the "conduct underlying" phrases the same meaning. *See Powerex Corp.*, 551 U.S. at 232 (finding the maxim that identical phrases generally have the same meaning "doubly appropriate" where a phrase "was inserted into" two provisions "at the same time").

Looking to the statute's broader context, the Court recognizes that FOSTA-SESTA is a remedial statute. *See Twitter*, 2021 WL 3675207, at *24 ("There is no question that FOSTA is a remedial statute in that it carves out exceptions to CDA § 230 immunity, thereby affording remedies to victims of sex trafficking that otherwise would not have been available."). But the Court finds that the plain language interpretation described above squares with FOSTA-SESTA's broader context, in that Congress sought to provide victims of sex trafficking access to courts and improve prosecutorial tools against websites that facilitate sex trafficking.

Plaintiff argues that this interpretation "would effectively write Section 1595 out of existence for websites, which Congress cannot have intended to do when it passed FOSTA[-SESTA] specifically to put websites (like Craigslist) outside the scope of [s]ection 230 and within the reach of the TVPRA." COpp. at 14. While the Court acknowledges that Congress mentioned Craigslist by name during the

debates leading up to the passage of the statute, it disagrees with Plaintiff's conclusion. Under the Court's reading of the statute's plain language, a plaintiff can bring a claim against websites whose conduct amounts to a violation of section 1591, including its beneficiary provision (subject to a lower preponderance of the evidence standard of proof for a derivative civil claim), or websites that are ineligible for immunity because they create or materially contribute to the content at issue. *See In Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008) (holding that "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct"). And consistent with FOSTA-SESTA's remedial purpose, plaintiffs now can pursue a subset of claims that were previously barred. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016).

**\*7** To be clear, the Court does not find Plaintiff's interpretation of section 230(e)(5)(A) wholly implausible, particularly because there arguably is some tension between the Court's reading of the statute and the constructive knowledge standard set out in section 1595. But the Court does not find that the plain language interpretation, in context, produces an absurd or unreasonable result. *See United States v. Casasola*, 670 F.3d 1023, 1029 (9th Cir. 2012) (citations omitted) ("[C]ourts do not construe statutes in a manner that would lead to absurd results....Similarly, we do not impute to Congress an intent to create a law that produces an unreasonable result."). Instead, FOSTA-SESTA's other amendments suggest that Congress chose to focus on providing civil recourse against defendants who violate section 1591. Specifically, FOSTA-SESTA added a provision to section 1595 authorizing state attorneys general to bring *parens patriae* civil actions against "any person who violates section 1591." 18 U.S.C. § 1595(d). At oral argument on this motion, Craigslist pointed out that it would be unreasonable to conclude that Congress would allow state attorneys general to sue only "direct violators" of section 1591, while allowing private plaintiffs to sue civil defendants who only violated section 1595 based on the application of a constructive knowledge standard. Tr. at 17:5-18:4.

The Court readily acknowledges that it can be debated as a policy matter whether the approach taken by Congress was the most effective way to combat the perceived complicity of websites in the sex trafficking trade. As noted below, during the evolution of FOSTA-SESTA some members of Congress expressed concerns about whether a knowledge-based enforcement scheme would adequately impose accountability on such websites. But it is not the Court's role in this case to figure out what interpretation of the statute would lead to its own view of the best policy, and the Court finds that the discussion above accurately reflects the legislative judgment of Congress as expressed in the words of the statute that was actually passed.

**b. Legislative history**

Though the Court finds Craigslist's interpretation of the statute's plain language to be more persuasive, it recognizes that Section 230(e)(5)(A) is susceptible to another meaning. *Tides v. The Boeing Co.*, 644 F.3d 809, 814 (9th Cir. 2011) ("If the statutory language is ambiguous...we may refer to legislative history to discern congressional intent."). "Generally, [courts] may turn to legislative history for guidance only when a statute is susceptible to two or more meanings,...but the plainer the language, the more convincing contrary legislative history must be." *United States v. Thomsen*, 830 F.3d 1049, 1058 (9th Cir. 2016) (alterations and quotation marks omitted) (quoting *Schroeder v. United States*, 793 F.3d 1080, 1085 (9th Cir. 2015)).

As an initial matter, the parties dispute the weight to afford the fact that Congress mentioned Craigslist by name as reflected in the legislative history. Plaintiff cites Senator Richard Blumenthal's statement that "[a]s a State prosecutor, I was told that I could not pursue actions again craigslist or other sites nearly a decade ago because of that section and the interpretation. Clearly, the websites that facilitate this, knowingly encouraging and profiting from sex trafficking, must face repercussions in the courtroom." 164 CONG. REC. S1849, at S1851 (daily ed. March 21, 2018) (statement of Senator Blumenthal). Craigslist responds that Senator Blumenthal's statement referenced his experience with state criminal prosecutions and "is consistent with the fact that FOSTA[-SESTA] created new CDA exemptions for state criminal prosecutions." CReply at 3. The Court agrees, and finds that the cited language does not suggest that Congress intended to make Craigslist (or other websites) civilly liable when their conduct does not violate Section 1591, and when they otherwise meet the requirements for establishing CDA immunity.

Plaintiff also points to Senator Blumenthal's legislative statement regarding the purpose of FOSTA-SESTA. Senator Blumenthal said that "[t]he purpose of our measure, very simply, is to give survivors their day in court. Right now, the courtroom doors are barred to them, as a recent court

of appeals opinion remarked, outrageously so. It would also open avenues of prosecution to law enforcement where they are currently roadblocked." 164 CONG. REC. S1849, at S1851 (daily ed. March 21, 2018) (statement of Senator Blumenthal). But again, the Court finds its plain language reading consistent with the described aims of FOSTA-SESTA. The Court also notes that statements by individual legislators "rank among the least illuminating forms of legislative history." See *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943, 197 L. Ed. 2d 263 (2017). "[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent." *United States v. Shaw*, 936 F.2d 412, 416 (9th Cir. 1991) (quoting *Brock v. Pierce County*, 476 U.S. 253, 263 (1986)).

**\*8** In all, the Court does not find Plaintiff's limited references to the legislative history persuasive. As noted, there must be "convincing contrary" evidence to overcome the provision's plain meaning. See *Thomsen*, 830 F.3d at 1058. Having conducted an in-depth review of the legislative history, as summarized below, the Court finds no such evidence here.

As previously noted, FOSTA-SESTA is the combination of companion bills from the House and Senate. On April 3, 2017, Congresswoman Ann Wagner introduced House Bill 1865, known as FOSTA. See Allow States and Victims to Fight Online Sex Trafficking Act of 2017, H.R. 1865, 115th Cong. (as introduced, Apr. 3, 2017). As introduced, this bill contained more expansive, victim-centered provisions, including amending the CDA to allow victims of sex trafficking to exercise the private right of action under section 1595. Specifically, it stated:

> (5) No Effect on Civil Law Relating To Sexual Exploitation of Children or Sex Trafficking—Nothing in this section shall be construed to impair the enforcement or limit the application of— (A) section 1595 of title 18, United States Code; or (B) any other Federal or State law that provides causes of action, restitution, or other civil remedies to victims of— (i) sexual exploitation of children; (ii) sex trafficking of children; or

(iii) sex trafficking by force, threats of force, fraud, or coercion *Id.* § 3. And it broadly defined "participation in a venture" to "include[ ] knowing or reckless conduct by any person or entity and by any means that furthers or in anyway [sic] aids or abets the violation of subsection (a)(1)." *Id.* § 4.

On August 1, 2017, Senator Rob Portman and Senator Richard Blumenthal introduced Senate Bill 1693, known as SESTA. *See* Stop Enabling Sex Traffickers Act of 2017, S. 1693, 115th Cong. (as introduced, Aug. 1, 2017). Among the relevant changes, the companion bill amended section 1591 to define "participation in a venture" as "knowing conduct by an individual or entity, by any means, that assists, supports, or facilitates a violation of subsection (a)(1)." *Id.* § 4. As to the federal civil sex trafficking carve-out in the CDA, it stated:

> (5) NO EFFECT ON CIVIL LAW RELATING TO SEX TRAFFICKING.—Nothing in this section shall be construed to impair the enforcement or limit the application of section 1595 of title 18, United States Code.

*Id.* During the legislative hearing on SESTA, Senator Portman explained that SESTA "would allow sex trafficking victims to get the justice they deserve against websites that knowingly, knowingly, facilitate sex trafficking against them." SESTA, Hearing on S. 1693 Before the Comm. on Commerce, Sci., and Transp., 115 Cong. 7 (2017). He emphasized the "high bar" the "knowing standard" raises to "protect[ ] good tech actors and target[ ] rogue online traffickers like Backpage." *Id.* Senator Blumenthal reiterated the "high bar" framing and noted "[i]t is time to open the courthouse doors to victims of sex trafficking who have been sold into slavery as a result of ads that right now can enjoy absolute immunity for sites that knowingly facilitate, support, or assist—knowingly facilitate, support, or assist." *Id.* at 9.

Several witnesses raised concerns about how to define the appropriate standard. For example, the general counsel of the Internet Association noted that organization's "support [of] targeted legislative changes...that would allow victims and survivors to seek justice against bad actors that knowingly facilitate sex trafficking." *Id.* at 30–31 (statement of Abigail Slater, General Counsel, Internet Association). In her prepared statement, she expressed concern about "frivolous litigation targeting legitimate, law-abiding intermediaries, as civil liability is unbounded by any actual knowledge or participation in trafficking" and advised that a "tailored amendment that ensures civil suits were brought against online actors that acted with knowledge and intent is worth consideration." *Id.* at 35–36. Senator Brian Shatz later stated that Congress "obviously want[ed] to provide space and not deter proactive actions by good actors that are doing the right thing to mitigate sex trafficking on their platforms" and voiced the concerns of "big platforms" that are "worried that their knowing at all triggers the knowing part of the statute." *Id.* at 41. In response, a law professor explained that

**\*9** the knowledge standard, especially in the case of civil claims, is a new thing for Section 230. In general, Section 230 has not had a civil exception that has been predicated on knowledge. So the opening up of the door to looking at a site's knowledge will be something that we haven't seen before, and because of that we're going to have a lot of questions. What exactly did the site know and when? And what— and how do we characterize that under the legal standards?

...

[W]e would want to be extremely explicit about exactly when that knowledge occurred because otherwise there will be lots of discussion and debates over, well, you knew it based on you having taken this step or that step, or inferentially you should have known, or constructive knowledge, you should have been realizing what was taking place on your site. All of those will become the basis of which there will be plenty of disputes.

*Id.* at 42–43 (statement of Eric Goldman, Professor, Santa Clara University of Law). With respect to prosecutions, then-California Attorney General Xavier Becerra explained that the CDA could be amended narrowly without affecting innovation because prosecutors must meet the criminal burden of proof. *Id.* at 44, 53. Soon after, Professor Goldman clarified that "the civil provisions would not be subject to the same burden of proof that Attorney General Becerra talked about," and explained that there are "two different things we're talking about simultaneously." *Id.* at 47.

Senator John Thune later presented an amended version of SESTA that would replace the entirety of the original bill. *See* SESTA, S. 1693, Thune Substitute, 115th Cong. (1st Sess. 2017). As amended, SESTA included many of the provisions that would later be incorporated into FOSTA-SESTA. It provided language nearly identical to section 230(e)(5)(A) under the amended title "NO EFFECT ON SEX TRAFFICKING LAW," stating that "[n]othing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit...any claim in a civil action brought under section 1595 of title 18, United States Code, if the conduct underlying the claim constitutes a violation of section 1591 of that title." *Id.* § 3. In contrast to the reckless conduct standard proposed by FOSTA as introduced, SESTA defined "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." *Id.* § 4. Additionally, it amended section 1595 to add a *parens patrriae* provision authorizing state attorneys general to bring civil actions against "any person who violates section 1591." *Id.* § 5.

A committee report described the need for SESTA as amended:

> Many have argued that [ ] section [230] provides an essential underpinning of the modern internet and is critical to the explosive growth of websites that facilitate user-generated content. At the same time, however, those protections have been held by courts to shield from civil liability and State criminal prosecution nefarious actors, such as the website BackPage.com, that are accused of knowingly facilitating sex trafficking.

H.R. REP. NO. 115-199, at 2 (2017) (footnote omitted). It then explained the effect of SESTA as amended: "S. 1693 would eliminate section 230 as a defense for websites that knowingly facilitate sex trafficking. It would also empower State law enforcement to enforce criminal statutes against websites, and introduce new civil liabilities for violations of Federal criminal laws relating to sex trafficking." *Id.* (footnote omitted). The latter statement strongly suggests that the federal carve-out for section 1595 claims as framed in SESTA as amended covers only defendants whose own conduct violates section 1591.

**\*10** On November 30, 2017, the Subcommittee on Communications and Technology of the Committee on Energy and Commerce held another legislative hearing on SESTA. *The Latest Developments in Combating Online Sex Trafficking*, Hearing on S. 1693 Before the Subcomm. on Commc'ns and Tech., 115 Cong. 7 (2017). Appearing as a witness, Congresswoman Wagner urged Congress to "find a creative way to maintain the reckless disregard standard or at the very least, not raise the very high bar that victims and prosecutors must already meet in the federal criminal code." *Id.* at 14. She indicated that under SESTA, the "federal civil carve-out has been narrowed and is now based on the 'knowingly' mens rea standard, which will not provide operational recourse to justice for victims across the country and thus may not actually prevent future victimization." *Id.* at 12 n.7. She explained the challenges of gathering evidence to show a website " 'knowingly' assisted in a sex trafficking violation," and noted that prosecutors had "told [her] that any legislation that depends exclusively on the 'knowingly' *mens rea* standard to hold websites accountable will merely be a Washington, D.C., 'feel good' exercise." *Id.* at 14. Congresswoman Wagner asked the committee to consider whether under SESTA, a plaintiff raising a claim under section 1595

would have to establish that the website (1) "knowingly" benefitted financially through "participation in a [trafficking] venture" (defined as, "knowingly assisting, supporting, or facilitating" someone who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes or solicits by any means a person"), (2) "knowing...means of force, threats of force, fraud, or coercion will be used to cause the person to engage in a commercial sex act, or knowing that the person has not attained the age of 18 and will be caused to engage in a commercial sex act."

*Id.* at 12 n.7. She also listed a number of questions for the Committee to consider regarding the type of evidence a civil attorney could expect to rely on under such a heightened standard. *Id.* And Congresswoman Mimi Walters later raised similar questions about the evidence a civil attorney could use to establish a website's knowledge. *Id.* at 72–73.

Congressman Bob Goodlatte proposed an amendment rewriting FOSTA, and the House Judiciary Committee ordered the bill favorably reported. *See* H.R. Rep. No. 115-572, 115th Cong. 6 (as reported to House, Feb. 20, 2018). Key changes included enacting a federal offense concerning the promotion of prostitution and reckless disregard of sex trafficking, and excluding the proposed amendment to the CDA concerning civil sex trafficking actions. *See id.* at 8–9.

A committee report on Congressman Goodlatte's proposal explained that "[s]ome websites have gone beyond merely hosting advertisements,...and have purposely created platforms designed to facilitate prostitution and sex trafficking." H.R. REP. NO. 115-572, at 3 (2017). It stated that "current federal criminal law, which is unaffected by the CDA, presently lacks proper prosecutorial tools to combat these websites." *Id.* at 4–5. It further stated that section 1591's "knowledge standard is difficult to prove" because "online advertisements rarely, if ever, indicate that sex trafficking is involved." *Id.* at 5. It explained that "[p]rostitution and sex trafficking are inextricably linked," and that a "new statute that instead targets promotion and facilitation of prostitution is far more useful to prosecutors." *Id.* The report explained the effect of the bill as follows:

> H.R. 1865 will allow vigorous criminal enforcement against all bad-actor websites, not just Backpage.com, through the creation of a new federal law and by explicitly permitting states to enforce criminal laws that mirror this new federal law and current federal sex trafficking law. With this robust criminal enforcement, victims will have more opportunities to obtain restitution. Furthermore, this enforcement will also provide victims with information that will be sufficient to establish successful civil pleadings, by revealing the extent of content development in which these websites engage.

*Id.* at 6. During the markup of the amendment, Congressman Jerry Nadler said that several "organizations that represent victims of online sex trafficking" believed that Congressman Goodlatte's proposal failed to provide adequate relief for victims of trafficking. Markup of H.R. 1865; and H.R. 2595 Before the H. Comm. On the Judiciary at 11 (Dec. 12, 2017).

**\*11** Congresswoman Walters later introduced another amendment to FOSTA that included the enactment of a new federal offense concerning prostitution, but also incorporated elements from SESTA as amended, including the narrowed federal civil sex trafficking carve-out and the definition of "participation in a venture." FOSTA, Amendment to H.R. 1865. A committee report summarized the Walters amendment as "[a]llow[ing] enforcement of criminal and civil sex trafficking laws against websites that knowingly facilitate online sex trafficking." H.R. REP. NO. 115-583, at 2 (2018).

On February 26, 2018, the House Rules Committee took up both amendments. And what became known as the FOSTA-SESTA package bill passed the House on February 27, 2018, and the Senate on March 21, 2018. Congresswoman Wagner stated that "it ha[d] not been an easy journey...to find middle ground with the tech industry and the victims' advocates to incorporate the concerns of prosecutors and the law enforcement community," but that "FOSTA, combined with the Walters amendment, which is SESTA, w[ould] provide better civil justice for victims, more prosecutions of bad actor websites, more convictions, and more predators behind bars." 164 CONG. REC. H1278 (daily ed. Feb. 27, 2018). She also described the challenges of targeting websites using sex trafficking laws:

> Because indications of knowledge of sex trafficking are typically hidden, it is nearly impossible for prosecutors to demonstrate beyond a reasonable doubt that the website operators knew that the ads involved sex trafficking. This is why prosecutors tell me that they would oftentimes prefer to use prostitution laws instead of sex trafficking laws when charging these websites.

...

Sex trafficking laws are written to target pimps, johns, and businesses, but are not always the best tool against the online sex trade.

*Id.* at H1294. And consistent with others' previous statements concerning the federal civil sex trafficking carve-out, she stated that "[n]o website is immune from civil liability for knowingly facilitating the sale of trafficking victims." *Id.* at H1303; *see also id.* at H1302 (statement of Rep. Walters) (noting that FOSTA-SESTA "will allow enforcement of criminal and civil sex trafficking laws against websites that knowingly facilitate online sex trafficking activities").

Ultimately, Congress passed a bill incorporating the provision that the sponsor of FOSTA as originally introduced acknowledged presented a "narrowed" "federal civil carve-out" that is "subject to a heightened pleading standard." *The Latest Developments in Combating Online Sex Trafficking*, Hearing on S. 1693 Before the Subcomm. on Commc'ns and Tech., 115 Cong. 7, 12 & n.7 (2017) (statement of Rep. Wagner).[4] Notwithstanding the well-understood challenges inherent in showing a website's knowledge, it thus appears that Congress reached a compromise by including a narrowed federal civil sex trafficking carve-out that requires plaintiffs to show the civil defendant's knowing assistance, support or facilitation, while also enacting a criminal offense (now codified at 18 U.S.C. § 2421A) that, at least in theory, targets bad actor websites and includes a civil recovery provision. And this summary of the legislative history is supported by the legislative discussion prior to the bill's passage in the Senate. *See* 164 CONG. REC. S1849, at S1857 (daily ed. March 21, 2018) (statement of Senator Nelson) (noting that FOSTA-SESTA would "eliminate the safe harbor for sex traffickers, and it would allow State attorneys general, other State and local prosecutors, and the victims themselves to go after the websites that knowingly provide a platform for sex trafficking....It would also make key changes to Federal criminal law to enable law enforcement to better target websites."); *id.* at S1860 (statement of Senator Leahy) ("Today's legislation amends CDA 230 by...prohibiting construing that law to limit Federal or State civil liability for conduct that involves 'knowingly assisting, supporting, or facilitating a violation of Federal child sex trafficking laws."); *id.* at S1864 (statement of Senator Sullivan) ("The bipartisan legislation we are debating right now will ensure that websites...that knowingly—and that is an important word, 'knowingly'—facilitate sex trafficking can be held accountable for their actions.").

**\*12** Plaintiff has pointed to nothing in the legislative history, even if considered, that runs counter to the Court's plain language reading. And even to the extent the individual legislator statements cited by Plaintiff or the additional statements described above are sufficiently reliable, the Court finds them consistent with the statutory language and other legislative history. *See Shaw,* 936 F.2d at 416.

### iii. Conclusion

The Court finds that the most persuasive reading of section 230(e)(5)(A) is that it provides an exemption from immunity for a section 1595 claim if, but only if, the defendant's conduct amounts to a violation of section 1591. To the extent Plaintiff's interpretation is plausible, the legislative history does not present sufficiently "convincing contrary" evidence to overcome the provision's plain meaning. *See Thomsen,* 830 F.3d at 1058. Notwithstanding the policy debates aired throughout FOSTA-SESTA's development, this interpretation is also facially consistent with the CDA's stated policies "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation" and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." *See* 47 U.S.C. § 230(b). The Court thus interprets section 230(e)(5)(A) to limit the scope of civil sex trafficking claims against interactive computer services that otherwise meet the requirements for CDA immunity to circumstances in which the defendant's conduct amounts to a violation of section 1591.

### B. Craigslist's Motion to Dismiss TVPRA Claim

Based on the Court's analysis and conclusions above, to defeat CDA immunity, Plaintiff must allege that Craigslist's conduct constituted a violation of section 1591. Craigslist argues that because Plaintiff has previously stated that she has made no such allegations, the TVPRA claim must be dismissed. CMot. at 9. The record supports this characterization. *See, e.g.*, Dkt. No. 69 at 6–7 ("But J.B.'s complaint is clear that she is pleading a cause of action for *beneficiary* liability against Craigslist pursuant to § 1595 of the TVPRA, not perpetrator liability pursuant to § 1591.") (emphasis in original). And apart from the parties' arguments about the applicable standard, the briefing did not discuss whether Plaintiff's allegations suffice to show that Craigslist's conduct amounts to a violation of the beneficiary provision of section 1591.[5] Given the Court's ruling, which substantially alters the pleading burden previously found to apply, the Court

**DISMISSES** Plaintiff's TVPRA claim **WITH LEAVE TO AMEND**.

### IV. ECONOMY INN'S MOTION TO DISMISS

The Court previously found that Plaintiff had not plausibly alleged intent, as required under the CTVPA. Plaintiff contends that additional allegations provided in the FAC show that Economy Inn, at minimum, should have known that Plaintiff was being trafficked. For example, she details several overtly violent altercations, described above, and alleges that her physical condition deteriorated while a guest at Economy Inn. But as the Court previously held, "[t]he CTVPA does not include negligent 'should have known' language as in the TVPRA; cases interpreting the CTVPA have required plaintiffs to plausibly allege intent at the pleading stage." Order at 17 (citing *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155-WHO, 2020 WL 3035794, at *2 (N.D. Cal. June 5, 2020)).

**\*13** Plaintiff nonetheless maintains that pleading intent is not required, asserting that "the CTVPA permits claims against a beneficiary of a victim's trafficking, to the extent the beneficiary knew or should have known that the trafficking was occurring." EOpp. at 1. Plaintiff acknowledges the Court's previous holding, but directs the Court to two cases the Court did not address in its previous Order. EOpp at 5 n.1. First, citing *Lesnik v. Eisenmann SE,* Plaintiff argues that the CTVPA is meant to "mirror the TVPRA" and does not provide a separate basis for liability. See 374 F. Supp. 3d 923, 954 (N.D. Cal. 2018) (finding that "because Plaintiffs' TVPRA claim survives as to [Defendants], Plaintiffs' CTVPA claim does as well."). Second, Plaintiff cites *Novoa v. GEO Grp., Inc.,* No. EDCV 17-2514 JGB, 2019 WL 7195331, at *16, n.11. (C.D. Cal. Nov. 26, 2019), for the proposition that the CTVPA and TVPRA "overlap" and that a CTVPA claim should "survive to the same extent" as a TVPRA claim. Based on this language, Plaintiff contends that TVPRA claims—which do not require alleging intent—and CTVPA claims are "coextensive." FAC ¶ 26.

But Economy Inn correctly notes that neither case "reached the analysis of whether the CTVPA required further allegations because the issue was undisputed." EReply at 2. As for *Lesnik*, the parties did not dispute "that the CTVPA does not provide a separate basis for liability from the TVPRA." See 374 F. Supp. 3d at 954. And as for *Novoa*, the court addressed whether the plaintiffs met the requirements of class certification with respect to a proposed class alleging violations of the TVPRA and CTVPA, not whether the plaintiffs adequately pled a CTVPA claim. See 2019 WL 7195331, at *1, 19; see also *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." (internal quotations omitted)). Moreover, the court stated that "the elements of a CTVPA and TVPRA claim overlap significantly," not that they correspond exactly. See *Novoa*, 2019 WL 7195331, at *16 n.11. The court found that the predominance requirement was met for the TVPRA and CTVPA claims, in part because of the overlapping elements, including "the reasonable person analysis." *Id.* But notably, the court acknowledged that "[t]he second element of a CTVPA offense focuses on the defendant's *intent* to obtain forced labor or services." *Id.* (emphasis added).

The Court thus finds neither of these cases persuasive. The Court's holding is in line with those of other courts that have similarly interpreted the CTVPA to require plaintiffs to plausibly allege intent. See *K.R. v. G6 Hospitality*, LLC, No. 19-cv-08252-VC, 2020 WL 5653287, at *1 (N.D. Cal. Sept. 23, 2020) (dismissing with prejudice claims under California Civil Code § 52.5, where plaintiff again failed to allege intent in her amended complaint); *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-0155-WHO, 2020 WL 6318707, at *11 (N.D. Cal. Oct. 28, 2020) ("*J.C. II*"); *Lofthus v. Long Beach Veterans Hosp.*, 214 F. Supp. 3d 908, 916 (C.D. Cal. 2016). By alleging that Economy Inn knew or should have known that sex trafficking was occurring on its property, Plaintiff has not alleged intent. Because Plaintiff has already been given an opportunity to amend, and either cannot or maintains she need not meet the legal standard the Court has found to apply, the Court **GRANTS** Economy Inn's motion to dismiss Plaintiff's CTVPA claim **WITHOUT LEAVE TO AMEND**.

### V. HOLIDAY MOTEL'S MOTION TO DISMISS AND MOTION FOR A MORE DEFINITE STATEMENT

Holiday Motel argues that all claims brought by Plaintiff fail to state a cognizable claim. First, Holiday Motel argues that Plaintiff has failed to adequately plead a violation of the TVPRA because the TVPRA requires a showing of direct involvement in a sex trafficking venture. HMot. at 6–7. Second, Holiday Motel contends that Plaintiff has not plausibly pled Holiday Motel's intention to benefit from a sex trafficking venture, as required under the CTVPA. *Id.* at 9. Third, Holiday Motel argues that Plaintiff has not adequately pled negligence because motel owners need not monitor their guests or provide their employees with sex trafficking

awareness training. *Id.* at 10–11. Finally, Hotel Motel moves for a more definite statement, contending that Plaintiff has not provided enough specificity in her claims to allow Holiday Motel to reasonably prepare a response. *Id.* at 11.[6]

**A. Motion to Dismiss TVPRA Claim**

**\*14** Holiday Motel argues that Plaintiff has not sufficiently pled a violation of the TVPRA. To establish beneficiary liability under 18 U.S.C. § 1595(a), Plaintiff must establish that (1) Holiday Motel knowingly benefitted financially or by receiving anything of value (2) by participating in the sex trafficking venture (3) that Holiday Motel knew or should have known constituted sex trafficking. Plaintiff's allegations are sufficient to allow the Court to plausibly infer Holiday Motel's negligence (at a minimum) and thus civil liability under the TVPRA.

**i. Knowing benefit**

Plaintiff alleges that Holiday Motel "financially benefited from her trafficking on each occasion that [it] received payment for the rooms where she was trafficked." FAC ¶ 21. Holiday Motel concedes that "room rental revenues are certainly a financial benefit or a thing of value[ ] to qualify as actionable under the TVPRA." HMot. at 8. The Court agrees: rental of a room "constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element" of knowing benefit. *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-CV-00656-BLF, 2020 WL 4368214, at \*4 (N.D. Cal. July 30, 2020); *J.C. II*, 2020 WL 6318707, at \*4 (same). The Court finds that Plaintiff has sufficiently alleged that Holiday Motel "knowingly benefited" from sex trafficking.

**ii. Participation in a venture**

As to the second element, each of Holiday Motel's arguments fails. First, Holiday Motel conflates the standards under sections 1591 and 1595, asserting that participation "must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture." *See* HMot. at 7 (citing *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018)). But *Noble* dealt with the requirements for participation under section 1591, a criminal statute. Under the TVPRA's civil remedy, participation need not be knowing: otherwise the "should have known" language in § 1595 would be devoid of meaning. *See* Order at 13; *see also M.A.*, 425 F. Supp. 3d at 969. Section 1595 is a standalone claim and does not require knowledge or recklessness (like section 1591), but only negligence at a minimum. *See Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at \*4 (S.D. Ohio Mar. 16, 2020) (holding that "§ 1595(a) can be a standalone claim, and civil Defendants need not have committed the underlying criminal sex trafficking offense under § 1591") (citation omitted).[7]

Second, Holiday Motel contends that participation must constitute "affirmative conduct furthering the sex-trafficking venture." HMot. at 7 (citing *Geiss*, 383 F. Supp. at 169). *Geiss* held that "§ 1591 targets those who participate in sex trafficking; it does not target [those] who turn a blind eye to the source of their financial sponsorship." 383 F. Supp. 3d at 169 (citation omitted). But section 1595, at issue here, requires only that a defendant be negligent as to the source of its financial benefit, not that it participate directly in the human trafficking venture. *H.H.*, 2019 WL 6682152, at \*2 ("The statutory language [of § 1595] requires that Defendant knowingly benefit financially, not that the perpetrator compensate Defendant 'on account of' the sex trafficking."); *Doe S.W.*, 2020 WL 1244192, at \*5 ("The first element merely requires that Defendant knowingly receive a financial benefit, not that the perpetrator have actual knowledge of the sex trafficking venture.").

**\*15** Because Plaintiff need only allege that Holiday Motel was negligent with respect to the source of its benefit, the Court analyzes the constructive knowledge requirement under the tacit agreement standard. *See* Order at 13. Here, Plaintiff has alleged sufficient facts to allow the Court to infer a pattern of conduct or a tacit agreement between Holiday Motel and Plaintiff's trafficker. Specifically, Plaintiff alleges a pattern of conduct between Holiday Motel and Plaintiff's trafficker where "Plaintiff's trafficker paid daily for the room, each visit lasted at least one week, and the manager would come to the room every day prior to checkout at 11 a.m. to ask whether Plaintiff's trafficker wanted to rent the room for another day." FAC ¶ 93. The Court finds that Plaintiff has sufficiently alleged that Holiday Motel "participated in a venture."

**iii. Knew or should have known**

Holiday Motel contends that Plaintiff has not alleged sufficient facts to plausibly infer that Holiday Motel knew or should have known that she was being sex trafficked. HMot. at 5, 8–9. Plaintiff has alleged, among other things, the following facts:

a. At check-in, Plaintiff would be accompanied either by her trafficker, who would check her into the motel room but not proceed to the room itself, or by an adult male buyer, who was typically and quite obviously much older than the teenaged Plaintiff and accompanied her to the room for only a brief (one- to two-hour) visit.

b. The men who accompanied Plaintiff, whether pimp or buyer, never carried any luggage, and avoided eye contact with staff as they escorted Plaintiff, who was often showing signs of distress, malnourishment, and prominent bruising on her person.

c. The rooms where Plaintiff was trafficked were frequently purchased with cash.

d. To meet her traffickers' daily quotas, Plaintiff's rooms maintained high foot traffic with multiple adult males per day.

e. Plaintiff's traffickers would refuse maid service during the length of the stay, even though maids observed the traffickers (and many buyers) entering and exiting the rooms.

f. The rooms where Plaintiff was trafficked were frequently left strewn with...an inordinate number of used condoms, and drug and alcohol paraphernalia.

FAC ¶ 60. This Court agrees with others that have found similar fact patterns to satisfy the pleading requirements of negligence under the TVPRA. See *J.C. II,* 2020 WL 6318707, at *5; *B.M.*, 2020 WL 4368214, at *1; *M.A.*, 425 F. Supp. at 966–68; *Doe S.W.*, 2020 WL 1244192, at *5, 8; *H.H.*, 2019 WL 6682152, at *3. In *M.A.*, for example, as here, plaintiff alleged that the trash cans in the rooms in which she was trafficked would often contain "an extraordinary number of used condoms," that her trafficker paid in cash, and that she was forced into sexual encounters with numerous "johns" per day. 425 F. Supp. at 967. The Court finds that Plaintiff has sufficiently alleged that Holiday Motel "knew or should have known" the venture it was participating in was engaged in sex trafficking.

In addition to Plaintiff's specific allegations, failure on the part of Holiday Motel to implement policies to address a known problem on its premises, like sex trafficking, also supports an inference of negligence. *See M.A.*, 425 F. Supp. at 968 ("Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.") (citation omitted); *Doe S.W.*, 2020 WL 1244192, at *1, 5 (noting that plaintiff alleged that "hotel Defendants knew that sex trafficking occurred frequently on their properties and failed to prevent it"). Holiday Motel contends that it had no duty to address the issue since, during the time Plaintiff was allegedly trafficked, California had not yet passed legislation requiring motels to post notice about common trafficking signs or to train employees on human trafficking awareness. HMot. at 10–11. But the Court rejects Holiday Motel's assertion that legislative mandates are required for a motel to have a duty to protect its guests against foreseeable harms.

**\*16** Plaintiff's TVPRA claim thus survives Holiday Motel's motion to dismiss. That said, her claims may proceed only to the extent they are based on conduct that occurred after December 23, 2008, when the TVPRA was amended to include beneficiary liability under section 1595. "The Supreme Court has recognized a 'time honored presumption [that] unless Congress has clearly manifested its intent to the contrary,' 'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place.' " *Ditullio v. Boehm*, 662 F.3d 1091, 1099 (9th Cir. 2011) (citation omitted). To assess whether a statute applies retroactively, courts consider (1) "whether Congress has expressly prescribed the statute's proper reach," and if not, (2) whether the statute has a "retroactive consequence in the disfavored sense." *Id.* (citations omitted).

In reauthorizing the TVPRA in 2008, Congress did not expressly state whether the amendments applied retroactively. *See Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS, 2018 WL 2193644, at *11–13 (S.D. Cal. May 14, 2018). The Court thus must consider whether the amendment "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *See Ditullio*, 662 F.3d at 1100 (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 269 (1994)). The amendment to section 1595, by newly providing a remedy against beneficiaries of human trafficking, "changed substantive law and attached legal burdens for violations to new parties." *M.L.*, 2020 WL 5494903, at *9; *see also Owino*, 2018 WL 2193644, at *11–13 (concluding 2008 TVPRA amendments do not apply retroactively). Therefore, the amendment to section 1595 does not apply retroactively.

Since Plaintiff has sufficiently alleged that Holiday Motel knowingly benefited from participation in a venture, which it knew or should have known was engaged in sex trafficking,

Holiday Motel's motion to dismiss Plaintiff's TVPRA claim is **DENIED** to the extent that the conduct underlying Plaintiff's claim occurred after December 23, 2008 and **GRANTED** to the extent this conduct occurred prior to that date.

### B. Motion to Dismiss CTVPA Claim

Plaintiff maintains that she has adequately alleged a CTVPA claim against Holiday Motel, largely reiterating the same arguments made with respect to Economy Inn. In her opposition to Holiday Motel's motion to dismiss, Plaintiff again cites *Lesnik* and *Novoa*, contending that TVPRA and CTVPA claims "mirror" one another and "overlap." HOpp. at 11–12. Plaintiff further argues that the legislative history supports such a finding, arguing the "[CTVPA's] author explained that 'civil recourse' is necessary to address 'the heinous acts perpetrated against' trafficking victims, particularly in cases where criminal prosecution does not occur due to 'the difficulty of meeting the higher burden of proof.' " *Id.* at 12 (citation omitted). Whatever appeal Plaintiff's argument may have as a policy matter, it cannot overcome the plain language of the underlying statute, Penal Code § 236.1, which requires intent. The Court reiterates its holding that the CTVPA requires plaintiffs to plausibly allege intent. Plaintiff does not allege that Holiday Motel *intended* to benefit from Plaintiff's forced labor or services. Neither does Plaintiff allege facts sufficient to allow the Court to reasonably infer intent. Because Plaintiff did not previously have an opportunity to amend this claim because the prior motions to dismiss filed by Economy Inn and Craigslist did not address it, the Court **GRANTS** Holiday Motel's motion to dismiss Plaintiff's CTVPA claim **WITH LEAVE TO AMEND**.

### C. Motion to Dismiss Negligence Claim

Largely because Plaintiff's TVPRA claim survives, so too does her negligence claim. To state a claim for negligence under California law, a plaintiff must establish the following elements: (1) the existence of a legal duty of care, (2) a breach of that duty, and (3) proximate cause resulting in injury. *Castellon v. U.S. Bancorp*, 220 Cal. App. 4th 994, 998 (Ct. App. 2013). Plaintiff "brings a claim under § 1595(a), which uses the words 'should have known,' and therefore invokes a negligence standard." *M.A.*, 425 F. Supp. 3d at 965. Holiday Motel, as an innkeeper, has a duty of care toward its guests, like Plaintiff. *Gray v. Kircher*, 193 Cal. App. 3d 1069, 1073 (Ct. App. 1987) ("[O]wners or possessors of land, and particularly innkeepers, have a duty of care to protect invitees or tenants from the reasonably foreseeable criminal or tortious conduct of third persons"). The allegations that speak to Holiday Motel's purported negligence and Plaintiff's resultant injuries are described above with respect to the TVPRA claim. Because Plaintiff has sufficiently alleged negligence under the TVPRA, Holiday Motel's motion to dismiss Plaintiff's separate negligence claim is **DENIED**.

### D. Motion For a More Definite Statement

**\*17** Federal Rule of Civil Procedure 12(e) permits a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." "A Rule 12(e) motion is proper only where the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted and therefore cannot reasonably be expected to frame a proper response." *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 896 (N.D. Cal. 2011) (citation and internal quotation marks omitted). "[T]he motion fails where the complaint is specific enough to apprise the defendant of the substance of the claim being asserted." *Id.* Finally, a motion for a more definite statement "is designed to strike at unintelligibility rather than want of detail and...allegations that are unclear due to a lack of specificity are more appropriately clarified by discovery rather than by an order for a more definite statement." *In re European Rail Pass Antitrust Litig.*, 166 F.Supp.2d 836, 844 (S.D.N.Y. 2001) (citation omitted).

Plaintiff has provided enough specificity and detail to allow Holiday Motel to reasonably prepare a response. Plaintiff is not required to provide exact details like names and dates in her pleading. *Osorio v. Tran*, No. CV 08-4007 HRL, 2008 WL 4963064, at \*2 (N.D. Cal. Nov. 19, 2008). "Such specificity in pleading is not required by Federal Rule of Civil Procedure 8(e). This is exactly the sort of information which should be obtained through the discovery process." *Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F. Supp. 940, 949 (E.D. Cal. 1981). Plaintiff has provided identifiable date ranges and enough detail with respect to the alleged circumstances and relevant individuals to allow Holiday Motel to frame a proper response. Therefore, Holiday Motel's motion for a more definite statement is **DENIED**.

### VI. CONCLUSION

The Court **GRANTS** Craiglist's motion to dismiss **WITH LEAVE TO AMEND**. Consistent with the date of the 2008 TVPRA amendments, the Court **GRANTS IN PART** and **DENIES IN PART** Holiday Motel's motions to

dismiss Plaintiff's TVPRA claim. Because Plaintiff has not sufficiently alleged intent with respect to Economy Inn or Holiday Motel, the Court **GRANTS** each party's motion to dismiss Plaintiff's CTVPA claims. The Court grants leave to amend only as to the CTVPA claim against Holiday Motel. Finally, the Court **DENIES** Holiday Motel's motion to dismiss Plaintiff's negligence claim and its motion for a more definite statement. Any amended complaint must be filed within 28 days of the date of this order.

IT IS SO ORDERED.

Dated: 9/8/2021

HAYWOOD S. GILLIAM, JR.

United States District Judge

**All Citations**

Slip Copy, 2021 WL 4079207

Footnotes

1  For prosecutions involving section 2421A, the CDA requires that "the promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted." 47 U.S.C. § 230(e)(5)(C).

2  Section 1595(a) and section 1591(a)(2) both include provisions for beneficiary claims, but those provisions impose different requirements. Section 1595(a) allows sex trafficking victims to bring a claim against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." Section 1591(a)(2) makes it unlawful to "benefit[ ], financially or by receiving anything of value, from participation in a venture which has engaged in" sex trafficking. Unlike section 1595, section 1591 defines "participation in a venture" to mean "knowingly assisting, supporting, or facilitating" a sex trafficking violation. *See* 18 U.S.C. § 1591(e)(4). It thus appears that a plaintiff raising a section 1595 beneficiary claim against a website otherwise entitled to CDA immunity could not benefit from the constructive knowledge standard if required to show that the civil defendant's conduct violated section 1591.

3  Section 1595 establishes civil penalties for anyone who knowingly benefits from participation in a venture which they knew or should have known was engaged in a violation under chapter 77, which encompasses a number of offenses beyond child sex trafficking. 18 U.S.C. §§ 1581–1591 (relating to peonage, slavery, involuntary servitude, forced labor, and trafficking).

4  This is consistent with Congressman Goodlatte's statement describing the benefit of a civil recovery provision attached to the new federal criminal statute (section 2421A) after acknowledging the challenges "for victims to show that a website knowingly facilitated sex trafficking." Markup of H.R. 1865; and H.R. 2595 Before the H. Comm. On the Judiciary 7–8 (Dec. 12, 2017) (statement of Congressman Goodlatte).

5  Plaintiff argues in a footnote that she "*does* allege that Craigslist *knowingly facilitated* sex trafficking," and "alleges sufficient facts to infer that Craigslist itself violated [s]ection 1591." COpp. at 15 n.8 (emphasis in original). But because this is the sum total of Plaintiff's current argument, and because she otherwise maintained that she need not prove Craigslist's conduct amounted to a violation of section 1591, the Court will allow Plaintiff an opportunity to replead her claim under the applicable standard.

6  Holiday Motel requested that the Court take judicial notice of several exhibits, including the complaint at issue here; Plaintiff's complaint filed on September 19, 2019 in Alameda Superior Court; a photograph of the Holiday Motel; and two deeds for transfer of Holiday Motel from the Alameda County Recorder's Office. Dkt. No. 143-2. The Court **DENIES** as moot the request to take judicial notice of the first amended complaint because the request is unnecessary. And because the Court need not consider the remaining exhibits in its analysis, the Court also **DENIES** those requests as moot. *See In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F. Supp. 3d 1108, 1118 (N.D. Cal. 2019) (denying as moot request for judicial notice of documents not considered by the court).

7  The Court notes that its holding regarding the standard for a civil claim asserted against a website like Craigslist does not apply here, since the CDA is inapplicable to Plaintiff's claim against Holiday Motel (which, without dispute, is not an "interactive computer service").

**End of Document**                                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.